SIERRA CLUB et al., Plaintiffs,

v.

Rogers C. B. MORTON et al.,
Defendants,

and

Peabody Coal Co. et al., Intervenor
Defendants.

Civ. A. No. 1182–73.

United States District Court,
District of Columbia.

Feb. 14, 1974.

Response to Remand Supplemental
Findings Nov. 25, 1974.

Bruce J. Terris, Suellen T. Keiner, Washington, D.C., for plaintiffs.

Herbert Pittle, Dept. of Justice, Washington, D.C., for Federal defendants.

Harold L. Talisman, Washington, D.C., for Cities Service Gas Co.

James W. McDade, Washington, D.C., for Peabody Coal.

Theodore Voorhees, Washington, D.C., for Westmoreland Resources.

Wendell Lund, Washington, D.C., for the Montana Power Co.

Max N. Edwards, Washington, D.C., for Patrick J. McDonough.

Stephen N. Shulman, Washington, D.C., for the Crow Tribe of Indians.

James D. O'Brien, Washington, D.C., for Puget Sound Power & Light Co., Portland General Electric, Montana Power Co., and the Washington Water Power Co.

Peter J. Nickles, Washington, D.C., for Kerr-McGee Corporation and American Electric Co.

James H. Krieger, Best, Best & Krieger, Riverside, Cal., for Peabody Coal Co.

Francis M. Shea, Shea & Gardner, Washington, D.C., for Montana Power Co., Puget Sound Power & Light Co., Portland General Electric Co., and Washington Water Power Co.

Peyton G. Bowman, III, Washington, D.C., for Arkansas Power & Light, Oklahoma Gas & Electric, Wisconsin Power & Light Co.

Charles A. Case, Jr., Washington, D.C., for Northern Natural Gas.

Robert L. Ackerly, Washington, D.C., for Panhandle Eastern Pipeline Co.

Henry B. Weaver, John E. Nolan, Jr., Steptoe & Johnson, Washington, D.C., for Atlantic Richfield Co.

Robert A. Pool, Oklahoma City, Okl., for Cities Service Gas Co.

## MEMORANDUM OPINION

PARKER, District Judge.

In this suit several environmental and public interest organizations sue the Secretaries of the Department of Interior, Department of Agriculture, Department of the Army and other Federal government officials claiming that they have violated the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* (NEPA). Plaintiffs seek a declaratory judgment, injunctive relief and mandamus and allege that the defendants in violation of NEPA mandates have permitted and authorized development of coal reserves in the Northern Great Plains region without first preparing a comprehensive environmental impact statement, systematic interdisciplinary studies of coal-development and a study of appropriate alternative courses of action. Several coal mining companies, electric power and utility companies and the Crow Tribe of Indians were allowed to intervene.

The matter came on for hearing upon plaintiffs' motion for summary judgment, the cross motions for summary judgment of the Federal defendants and of the intervening defendants, the motion for judgment on the pleadings of the intervening defendants, and the motions for partial summary judgment of intervening defendants Atlantic Richfield Company, Kerr-McGee Corporation, and Westmoreland Resources. Upon consideration of these motions, the affidavits, exhibits, answers to interrogatories and memoranda filed by the parties, and the oral arguments of counsel, the Court hereby enters the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. Plaintiffs are the Sierra Club, a nonprofit California corporation; the National Wildlife Federation, a nonprofit District of Columbia corporation; the Northern Plains Resource Council, a nonprofit unincorporated organization with members in Montana; the Montana League of Conservation Voters, an unincorporated organization with members in Montana; and the League of Women Voters of South Dakota, an unincorporated organization with principal offices in Rapid City, South Dakota. Many members of plaintiff organizations live, work, engage in recreational activities, own land and hold surface rights on or immediately adjacent to the sites of coal mining and related activities in the four-state area, Montana, Wyoming, North Dakota and South Dakota. These plaintiffs sue as organizations and on behalf of their members.

2. The defendants named in the complaint are Rogers C. B. Morton, the Secretary of the Interior; Marvin Franklin, Assistant Secretary for Indian Affairs of the

Department of the Interior; Gilbert G. Stamm, Commissioner of the Bureau of Reclamation of the Department of the Interior; Vincent E. McKelvey, Director of the United States Geological Survey of the Department of the Interior; Earl L. Butz, the Secretary of Agriculture; John R. McGuire, Chief of the Forest Service of the Department of Agriculture; Howard H. Callaway, the Secretary of the Army; and F. J. Clarke, Chief of Engineers, United States Army Corps of Engineers. Burton W. Silcock was also named as a defendant as Director of the Bureau of Land Management of the Department of the Interior but the United States has alleged that Curt Burkland is the Director of the Bureau of Land Management.

3. The following parties were allowed to intervene as defendants: Atlantic Richfield Company; Cities Service Gas Company; Westmoreland Resources; Peabody Coal Company; Kerr-McGee Corporation; American Electric Power System; Panhandle Eastern Pipe Line Company; Arkansas Power & Light Company; Oklahoma Gas & Electric Company; Northern Natural Gas Company; Wisconsin Power & Light Company; Patrick J. McDonough; The Crow Tribe of Indians; Montana Power Company; Puget Sound Power & Light Company; Portland General Electric Company; and the Washington Water Power Company.

4. By this suit plaintiffs seek a declaration that NEPA requires

the preparation and consideration of a comprehensive environmental impact statement concerning coal development in the Northern Great Plains region before issuing coal prospecting permits or mining leases, entering into options or contracts for the sale of water or taking any other actions concerning coal development in the Northern Great Plains region . . . .;

and that NEPA also requires

the carrying out of systematic interdisciplinary studies of the coal development in the Northern Great Plains region and the study of appropriate alternatives to this development.

5. Plaintiffs also seek an injunction against any actions by the Federal Government affecting coal development in the Northern Great Plains region pending the completion of an Environmental Impact Statement for that region and related studies under NEPA Sections 102(2)(A), (C), and (D).

6. The complaint asserts that the "Northern Great Plains region involved in this lawsuit includes northeastern Wyoming, eastern Montana, western North Dakota, and western South Dakota."

7. The "Northern Great Plains region" as described by the plaintiffs is not an entity, region, or area which has been defined by the Federal Government by statute or executive action for purposes of any Federal program, project, or action.

8. There is no existing or proposed Federal regional program, plan, project, or other regional "federal action" *within the meaning of NEPA Section 102(2)* for the development of coal or other resources in the area defined by the plaintiffs as the "Northern Great Plains region."

9. Pursuant to the authority of the Mineral Leasing Act of 1920, 41 Stat. 437, 30 U.S.C. § 181 *et seq.* as amended, the Department of the Interior, beginning in 1920 issued coal mining leases on Federal lands in Montana covering 33,000 acres. Of those leases, five are presently producing, including the lease issued in 1923.

Beginning in 1922, that Department commenced issuing coal leases covering 16,000 acres of land in North Dakota. Six of those leases, including the lease issued in 1922, are still producing.

Commencing in 1922, the Department of the Interior has issued coal leases covering 118,000 acres of Federal lands in northern Wyoming. Of those leases, only four are presently producing, including the lease issued in 1922.

10. Coal prospecting permits have also been issued for several thousand acres of Federal owned lands in Montana and Wyoming and in addition, several thousand acres of land in the Crow, Cheyenne, Ft.

Berthold, and Wind River Indian Reservations have been leased by the Tribes with the approval of the Bureau of Indian Affairs.

11. At the present time, coal is being produced from only *four* leases in Montana, *six* leases in North Dakota, and *four* leases in northern Wyoming. All producing coal mines are operating under approved mining plans and under state-approved reclamation plans.

12. On May 26, 1970, the Department of the Interior initiated the North Central Power Study. The purpose of that study was to investigate the potential for coordinated development of electric power supply in the north central United States. The Department of the Interior was aware that private companies have had plans or are developing plans for utilization of coal in the Northern Great Plains and many such development plans involve state or privately owned lands—not lands of the United States.

13. The Phase I report of that Study, which was a broad reconnaissance type study, was issued in October 1971 and utilities were given until July 1, 1972, to comment on the report. The responses received did not indicate that a plan for the coordinated development could be formulated and the study was terminated at the end of Phase I.

14. The Department of the Interior has taken action to control development of coal on a national basis, including the Northern Great Plains. It has initiated a study of potential water resource projects in southeastern Montana and northeastern Wyoming (the Montana-Wyoming Aqueducts Study). It has established a new national coal leasing policy and has halted the issuance of prospecting permits. It has also established a policy with respect to coal leasing of Indian lands and has instituted the Northern Great Plains Resources Program (NGPRP). Those actions, however, are not part of a plan or program to develop or encourage development but are attempts to control development by individual companies in a manner consistent with the policies and procedures of the National Environmental Policy Act of 1969.

15. The new national coal leasing policy was announced by the Secretary of Interior on February 17, 1973. This policy has both short-term and long-term aspects. One aspect of the policy is the preparation of an Environmental Impact Statement on the proposed Federal coal leasing in the United States. This statement is referred to as the coal programmatic EIS. The primary objective of the statement is to provide a national overview of the impact of the entire Federal coal leasing program on the quality of the human environment.

16. That statement will not deal with proposed developments of individual companies. It will serve as the foundation and framework for subsequent environmental analyses and supplemental statements which may be prepared for subregions, geological structures or basins, or on an individual basis for coal management actions. Also, the coal programmatic EIS is essential to the development of a planning system to determine the size, timing, and location of future coal leases in order to meet energy needs most effectively.

17. A working draft of the statement has been prepared and is currently undergoing internal review. When it is completed, it will be issued in draft form for general agency and public comment. This will allow public involvement in the analysis and review of the Federal leasing policies and procedures which have an impact upon the environment. It is planned that the final coal programmatic EIS will be issued in early 1974 following consideration of comments and necessary review.

18. Prior to the issuance of the coal programmatic EIS in its final form and the development of the planning system, coal leases will not be issued except pursuant to the short-term coal leasing policy which was announced in the news release of February 17, 1973. That policy dictates that coal leases will be issued only under the following conditions:

    a. When coal is needed now to maintain existing mining operations; or

b. When coal is needed as a reserve for production in the near future; and

c. When the land to be mined will in all cases be reclaimed in accordance with lease stipulations that will provide for environmental protection and land reclamation; and

d. When an environmental impact statement covering the proposed lease has been prepared when required under the National Environmental Policy Act.

19. The short-term leasing policy will restrain leasing in the Northern Great Plains region except under the conditions set forth in paragraph 18 and will limit the Department's actions to those for which it has an adequate information basis. It is intended to insure that current coal production can continue and to prevent deficiencies in supplies of coal which are necessary to meet continuing energy needs.

20. The information compiled and developed will expand the Department's informational basis upon which decision will be made. The coal programmatic EIS in its present form contains material relative to the Northern Great Plains. The section on the various environments where coal occurs includes an extensive part on the Northern Great Plains region with discussions relating to geology, topography, climate, hydrology, soils, vegetation, wildlife, land use, population patterns, and human value resources in the province. In addition, the section on impacts on the environment from coal leasing contains a part on the impacts unique to the Northern Great Plains region. Other material analyzed and developed in the coal programmatics EIS will be valuable in decision-making relative to the Northern Great Plains, such as discussions relating to measures to mitigate environmental impacts, alternative sources of energy, and conservation of energy use.

21. The issuance of coal prospecting permits by the Department of the Interior was halted by Secretarial Order No. 2952 issued February 13, 1973. No prospecting permits will be issued until further notice. The purpose of that order was to allow for the more orderly development of coal resources upon the public lands with proper regard for the protection of the environment in a manner consistent with the National Environmental Policy Act of 1969.

22. In fulfilling its fiduciary responsibilities, the policy of the Department with respect to approval of coal leasing on Indian lands is that approval will be granted where the tribal or individual Indian landowner desires to dispose of the minerals, where the terms and conditions of the lease are in the best interest of the Indian landowners, where appropriate environmental safeguards are imposed on the lessee and where the requirements of the National Environmental Policy Act have been satisfied.

23. The NGPRP study was initiated by the Secretary of Interior in an interdepartmental memorandum of June 30, 1972, and later announced in a press release of October 3, 1972. The study is to provide a tool for planning at all levels of government rather than to develop an actual plan. The study is being conducted by an interagency Federal-State Task Force with public participation. Its analyses are to be based on assumptions of various possible levels of resource development in order to provide an informational framework for informed decision-making and planning. The study will consist of a series of investigations and studies conducted by work groups in seven principal areas of concern: regional geology; mineral resources; water (supply and quality); air quality; surface resources; social, economic, and cultural aspects; and national energy consideration. The results of these investigations will be integrated into the development of scenarios for predicting the environmental and social consequences of various possible developments.

24. The NGPRP is financed and staffed and the study is underway. The work groups are in the field, public meetings have been held in the Northern Great Plains areas. The work groups are to complete their preliminary reports in the spring of 1974 and an overall interim report is to be prepared by June 1974. After review of the report, decisions will be made concern-

ing the necessity of further study in specific areas.

25. The purpose of the Department of Interior policy with respect to resource development in the Northern Great Plains areas is to insure that development does not proceed based solely on single purpose studies incapable of developing comprehensive information or by piecemeal actions which restrict future options. To fulfill that purpose the granting or approval of leases, special use permits and all types of rights-of-way across public lands, the delivery and sale of water and approval of mining plans relating to coal development in the Northern Great Plains areas will be held in abeyance pending the availability and analysis of the interim report from the NGPRP study or submitted to the Under Secretary of Interior for review and concurrence prior to execution.

26. With respect to the Montana-Wyoming Aqueducts Study, the decision was made in the fall of 1972, not to seek funding for fiscal 1974 and no funding will be sought for fiscal 1975. That study and other proposals such as the Morehead Dam will be held in abeyance pending the results of the NGPRP study.

27. After completion of the coal programmatic EIS in early 1974, decisions will be made concerning supplemental statements necessary for coal management actions. It is possible a decision will be made to prepare a statement for the entire Northern Great Plains region, but the information available may indicate that statements on smaller subregions, geologic structures, basin, or selected individual actions will fulfill the policy and procedural requirements of the National Environmental Policy Act in a more satisfactory manner. Until those decisions are reached, no new coal leases will be issued except pursuant to the short-term leasing policy. The interim report from the NGPRP will be available in the summer of 1974 and will provide an informational foundation for decision-making and planning. This information will be utilized in decision-making for all coal related actions in the Northern Great Plains

areas and will form a useful reference source for preparing environmental analyses and statements on proposed actions or groups of actions in the Northern Great Plains area. Until the interim report is available, decisions relating to coal development in the Northern Great Plains will be held in abeyance or submitted to the Under Secretary for review and concurrence.

28. Neither the Department of Agriculture, which has jurisdiction over issuance of permits for rights-of-way over lands within national forests, nor the Corps of Engineers, which has jurisdiction over navigable rivers, has pending before it any applications for any permits or rights-of-way within their authority to grant. Nor does either agency intend to consider such applications prior to June 30, 1974.

29. There is no existing or planned Federal program or action in the area defined by the plaintiffs as the "Northern Great Plains region" to which appropriations of funds have been allocated for implementation of proposals, or for which there is a schedule for the implementation of proposals, or as to which the Federal Government has made commitments to take further steps to carry out proposals.

30. There is no evidence of record in this case that in the area defined by the plaintiffs as the "Northern Great Plains region" that Federal action has been taken or is threatened to be taken on individual projects for the development of coal or other resources without compliance with the requirements imposed by NEPA and by applicable state laws relating to environmental consideration.

31. There is no evidence of record in this case that individual projects by private industry for the development of coal and other resources in the area defined by the plaintiffs as the "Northern Great Plains region" are being planned or constructed as part of any integrated plan or program for any such area, or that any such individual projects are interrelated or integrated with other like projects in such area.

32. There is no evidence in the record of this case that irreparable harm would result

to plaintiffs if an injunction were not granted as prayed or that the balance of equities favors the granting of such an injunction.

33. The record in this case establishes that large sums have been invested in good faith by the intervening defendants and others in connection with and in reliance upon individual existing and proposed projects in the "Northern Great Plains region" referred to in the complaint for the development of coal and other resources and for the use of such coal for the generation of electricity and production of synthetic natural gas; and that if an injunction as requested by the plaintiffs were to issue, irreparable harm would result to the intervening defendants, who have submitted affidavits describing their commitments and potential losses, and to the public at large.

## CONCLUSIONS OF LAW

1. The jurisdiction of the Court over the subject matter of this action is founded upon 28 U.S.C. § 1331(a).

2. Rule 56(c) of the Federal Rules of Civil Procedure requires that in order for a summary judgment to be entered in this case on the motion of any party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" must "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Committee for Nuclear Responsibility v. Seaborg,* 149 U.S. App.D.C. 380, 463 F.2d 783, 787–788 (1971); Fed.R.Civ.P. 56(c).

3. Section 102(2) of NEPA, 42 U.S.C. § 4332(2), requires "all agencies of the Federal Government" to

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decision-making which may have an impact on man's environment; . .

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented  . . .

(D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources

. . . . .

4. NEPA Section 102(2)(C) requires an environmental impact statement before "major Federal actions" are taken with respect to an individual Federal project. Multiple applications for Federal action in connection with individual private projects which are unrelated to each other, except that they involve resource development at some point within a multistate area, do not constitute a private or Federal regional plan or program for development, nor do they require the Federal Government to develop a regional plan or program for development with respect to such multiple applications. Questions relating to the scope of an environmental impact statement prepared for each individual application are to be decided initially by the Federal agency or agencies involved at the time action is taken upon such application. *Scientists' Institute for Pub. Info. v. AEC,* 156 U.S.App.D.C. 395, 481 F.2d 1079, 1091 (1973); *Jicarilla Apache Tribe of Indians v. Morton,* 471 F.2d 1275 (9th Cir. 1973); *Natural Resources Defense Council v. Morton,* 148 U.S.App.D.C. 5, 458 F.2d 827, 836 (1972).

5. The requirement in NEPA Section 102(2)(A) that Federal agencies utilize a "systematic, interdisciplinary approach . . . in planning and decisionmaking which may have an impact on man's environment" by its own terms does not require that such an approach be on a region-wide basis where, as in this case, the "planning and decisionmaking" is not on a region-wide basis. Similarly, the requirement in NEPA Section 102(2)(D) that Federal agencies "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources" by its own terms does not necessitate that the "appropriate alternatives" to be studied, developed, and described be on a region-wide basis where, as in this case, the "recommended course of action" is not on a region-wide basis. *See Environmental Defense Fund v. Hardin*, 325 F.Supp. 1401, 1403 (D.D.C.1971). Federal approval of individual projects or applications, including preparation of environmental impact statements relating thereto, need not await completion of "regional" studies not oriented to the particular project or application. *Jicarilla Apache Tribe of Indians v. Morton*, 471 F.2d 1275, 1280–1281 (9th Cir. 1973).

6. Since there is no existing or proposed regional program or project or other regional "federal action" within the meaning of NEPA Section 102(2) for the development of coal or other resources in the "Northern Great Plains region", the complaint does not set forth a claim upon which relief can be granted.

7. Questions relating to the scope and validity of studies and environmental impact statements in connection with proposed Federal actions under NEPA Sections 102(2)(A), (C) and (D) are to be decided by the Federal agency responsible for the proposed action with respect to an individual project, and the courts will not review the validity of supporting statements or studies until final Federal actions taken under NEPA Section 102(2) and until after final agency action has been taken with respect

to the individual project. *Scientists' Institute for Pub. Info. v. AEC*, 156 U.S.App. D.C. 395, 481 F.2d 1079, 1091 (1973); *Natural Resources Defense Council v. Morton*, 148 U.S.App.D.C. 5, 458 F.2d 827, 836 (1972); *Coalition for Safe Nuclear Power v. AEC*, 150 U.S.App.D.C. 118, 463 F.2d 954, 955 (1972); *Thermal Ecology Must Be Preserved v. AEC*, 139 U.S.App.D.C. 366, 433 F.2d 524, 526 (1970); *Gage v. Commonwealth Edison Co.*, 356 F.Supp. 80, 86 (N.D. Ill.1972); *Sherry v. Algonquin Gas*, 4 ERC 1713, 1714 (D.Mass.1972).

8. For the reasons set forth in Conclusion of Law No. 7 the complaint does not present a justiciable case or controversy with respect to proposed or future Federal action. *Eccles v. Peoples Bank of Lakewood Village*, 333 U.S. 426, 434, 68 S.Ct. 641, 92 L.Ed. 784 (1948); *Ashwander v. TVA*, 297 U.S. 288, 324, 56 S.Ct. 466, 80 L.Ed. 688 (1936); *Committee to Stop Route 7 v. Volpe*, 346 F.Supp. 731 (D.Conn.1972).

9. The Northern Great Plains Resource Program now being conducted under the auspices of the Department of the Interior is a study project and not a program for development, and it does not constitute "major Federal action" within the meaning of NEPA Section 102(2)(C). There has been no showing in this case that the Northern Great Plains Resources Program "has life" as a federal regional program for development of coal and other resources or is accompanied by either a schedule for implementation of concrete proposals, commitments that steps toward implementation will be taken, or specific annual appropriations for its work. *Scientists' Institute for Pub. Info. v. AEC*, 156 U.S.App.D.C. 395, 481 F.2d 1079, 1082–1084, 1087, 1095–1098 (1973).

10. Even if there were some regional Federal program for the development of coal and other resources in the "Northern Great Plains region", NEPA would not prohibit Federal action upon an individual project within the "region" on the basis of an environmental impact statement prepared for that project prior to

completion of the regional program. *Jicarilla Apache Tribe of Indians v. Morton*, 471 F.2d 1275 (9th Cir. 1973); *Indian Lookout Alliance v. Volpe*, 5 ERC 1749, 1754 (8th Cir. 1973); *Environmental Defense Fund, Inc. v. Armstrong*, 356 F.Supp. 131 (N.D. Cal.1973); *Movement Against Destruction v. Volpe*, 361 F.Supp. 1360 (D.Md.1973).

■ 11. Even if the complaint stated a claim upon which relief could be granted, plaintiffs would not be entitled to an injunction against any actions by the Federal Government affecting coal development in the Northern Great Plains region because there has been no showing in this case that irreparable harm would result in the absence of such an injunction or that the balance of equities favors the granting of such an injunction; and because the record discloses that such an injunction would cause irreparable injury to the defendants and to the public at large. *Aberdeen & Rockfish R.R. v. SCRAP*, 409 U.S. 1207, 1218, 93 S.Ct. 1, 34 L.Ed.2d 21 (1972); *Environmental Defense Fund, Inc. v. Froehlke*, 477 F.2d 1033, 1036, 1037 (8th Cir. 1973); *Sierra Club v. Hickel*, 433 F.2d 24, 33 (9th Cir. 1970).

12. On the basis of the foregoing findings of fact and conclusions of law, the motion for summary judgment filed by the Federal defendants and the motions for summary judgment and for judgment on the pleadings filed by the intervening defendants should be granted; and the motion for summary judgment filed by the plaintiffs should be denied.

## RESPONSE TO REMAND

On October 14, 1974, the United States Court of Appeals for the District of Columbia Circuit remanded this matter to the District Court for a further evidentiary hearing. Specifically, the Court of Appeals requested findings on certain matters embraced in nine questions. Pursuant to the remand a hearing was held and a schedule was developed for submissions by the parties. Affidavits from officials of the Departments of Interior, Agriculture and Army were submitted, with proposed findings. The plaintiffs were allowed to conduct discovery by way of written interrogatories, and by taking the deposition of William W. Lyons, Deputy Undersecretary of the Interior. This deposition was supplemented by Mr. Lyons' in-court testimony. Proposed findings were submitted by the plaintiff.

The Court has considered the responses and objections of both sides and enters its *Supplemental Findings on Remand.*

## SUPPLEMENTAL FINDINGS PURSUANT TO REMAND

*Inquiry No. 1*

Is the limitation on the issuance by the United States of coal leases announced on February 17, 1973, still in effect? How many leases have been issued for lands in the Northern Great Plains region since February 17, 1973?

*Finding*

The limitation on the issuance by the United States of coal leases announced on February 17, 1973 (the short-term coal leasing policy announced by Interior Secretary Morton in the news release of February 17, 1973, and set forth in Item 8 of Secretary Morton's affidavit of October 26, 1973) is still in effect. The Interior Department has not, since February 17, 1973, issued any coal leases in the Northern Great Plains region, which was defined in plaintiffs' original complaint as including northeastern Wyoming, eastern Montana, western North Dakota, and western South Dakota.[1] Pursuant to the national limitation on coal leases,[2] however, four leases covering a total of 4,018.95 acres have been issued since February 17, 1973, in parts of the United

---

1. *See Sierra Club v. Morton*, C.A. 1182–73 (February 14, 1974) at 4 (Findings of Fact, No's 6 and 7).

2. *Id.* at 6–7 (Finding of Fact, No. 15).

States outside of the Northern Great Plains region: [3]

| Lease | State | Date | Acreage |
|-------|-------|------|---------|
| ES–9403 | Pennsylvania | 7/1/74 | 29.661 |
| ES–12284 | Alabama | 6/1/74 | 2388.24 |
| U–13097 | Utah | 5/1/74 | 1310.00 |
| C–17130 | Colorado | 12/1/73 | 241.10 |

*Inquiry No. 2*

Is the suspension of the issuance by the United States of coal prospecting permits announced on February 13, 1973, still in effect? How many, if any, coal prospecting permits have been issued in the Northern Great Plains region since February 13, 1973?

*Finding*

The suspension of the issuance by the United States of coal prospecting permits, announced by Secretarial Order No. 2952 issued February 13, 1973 and attached as Exhibit II to Secretary Morton's affidavit of October 26, 1973, is still in effect. The Interior Department has not, since February 13, 1973, issued any coal prospecting permits in the Northern Great Plains region as defined by plaintiffs in their complaint.

*Inquiry No. 3*

To what extent has coal leasing on Indian lands in the Northern Great Plains region been approved by the Department of the Interior since February 17, 1973?

*Finding*

The Department of the Interior has not, since February 17, 1973, approved any coal leasing on Indian lands within the Northern Great Plains region as defined by plaintiffs in their complaint.

*Inquiry No. 4*

Have any applications for permits for rights-of-way over lands within national forests in the Northern Great Plains region been considered or acted upon by the De-

partment of Agriculture since June 30, 1974? Have any applications for permits for rights-of-way over navigable rivers in the Northern Great Plains region been considered or acted upon by the Corps of Engineers since June 30, 1974?

*Finding*

Since June 30, 1974 the Department of Agriculture has received the following four applications for rights-of-way over lands within national forests within the Northern Great Plains region as defined by plaintiffs in their complaint, all four on the Thunder Basin National Grasslands in Wyoming: by Wycoalgas Co. (water transmission line right-of-way); Rochelle Coal Co. (conveyor belt right-of-way); Atlantic Richfield Co. (plant site and railroad spur right-of-way); and Rochelle Coal Co. (railroad spur right-of-way). No action will be taken on any of these applications pending completion of an Environmental Analysis Report as to each by the Forest Service of the Department of Agriculture to determine whether or not an environmental impact statement pursuant to the National Environmental Policy Act is necessary and the completion of such an impact statement, if one is found to be necessary.

The Corps of Engineers has, since June 30, 1974, issued no permits for rights-of-way over navigable rivers within the Northern Great Plains region as defined by plaintiffs in their complaint. The following application in that region is pending: Minnkota Power Coop., transmission line crossing of Missouri River near Price, North Dakota. The Corps has, since June 30, 1974, issued two permits for structures in navigable rivers within that region: Square Butte Electric Co., water intake structure for generating plant cooling, near Bismarck, North Dakota (issued September 23, 1974); and Ottertail Power Co., removal of water intake structure for abandoned power plant near Washburn, North Dakota (issued October 15, 1974). Two applications for permits for structures in this region are pending: Mich-

**3.** Answers of Defendant, Rogers C. B. Morton, Secretary of the Interior, to Plaintiffs' Revised

Supplemental Interrogatories to Federal Defendants, filed November 11, 1974, at 1.

igan-Wisconsin Pipeline Co., water intake structure for coal gasification plant near Beulah, North Dakota; and Consolidated Development Co., water intake structure out of Oahe Lake for multiple purposes.

*Inquiry No. 5*

Has the Northern Great Plains Resources Program interim report been released? Is any further action contemplated regarding that program?

*Finding*

A draft interim report of the Northern Great Plains Resources Program was released on September 27, 1974,[4] to the participants in that study program for their comments by November 1, 1974; and a revised interim report of the study program is expected to be released to the public by the end of February, 1975. The separate reports of the seven work groups of the study program will also be released for public inspection at various locations. Thereafter the study program will continue to coordinate federal and state energy related studies, and further studies in specific subject areas will be conducted by appropriate federal and state entities.

*Inquiry No. 6*

Does the United States Government contemplate the preparation of any future environmental impact statements—other than statements for individual projects—for the Northern Great Plains area, the Fort Union Formation, or for any subregion thereof?

*Finding*

Decisions by the Department of Interior concerning the scope of future environmental impact statements in the Northern Great Plains region as defined by plaintiffs in their complaint, the Fort Union Formation, or any subregion thereof, will be based upon information developed from such sources as Interior's coal programmatic impact statement and the Northern Great Plains Resources Program and from the

nature and proximity of pending and proposed projects. The following statement in Interior Secretary Morton's affidavit of October 26, 1973, remains the most definitive description of that Department's posture with respect to future impact statements:

It is possible a decision will be made to prepare a statement for the entire Northern Great Plains region, but information available may indicate that statements on smaller subregions, geologic structures, basins or selected individual actions will fulfill the policy and procedural requirements of the National Environmental Policy Act in a more satisfactory manner.

The Department of Agriculture, through its Forest Service, has completed one impact statement (Badlands Planning Unit, Custer National Forest in North Dakota, August, 1974) and plans the following six others, on other than individual projects, within the Northern Great Plains region as defined by plaintiffs in their complaint, the Fort Union Formation, or any subregion thereof: Rolling Prairie Planning Unit, Custer National Forest in North Dakota, estimated for July, 1975; Cave Hills Planning Unit, Custer National Forest in South Dakota, estimated for December, 1975; Ashland Division Land Use Plan, Custer National Forest in Montana, estimated for May, 1976; Big Horn Land Use Plan, Big Horn National Forest in Wyoming, estimated for some time in 1977; and Thunder Basin National Grassland Land Use Plan in Wyoming, estimated for sometime in 1977. The foregoing impact statements relate or will relate to overall land use planning by the Forest Service in the management and administration of the National Forests and National Grasslands and concern coal and other energy development only as one of many considerations in land management.

*Inquiry No. 7*

What is the status of the granting of water rights and water contracts in the Northern Great Plains area?

4. This report was identified by William W. Lyons, Deputy Undersecretary of the Interior

(plaintiff's Exhibits 1, 2A, 2B, and 2C) at his deposition on November 4, 1974.

*Finding*

The Forest Service of the Department of Agriculture has no plans to grant water rights or water contracts in the Northern Great Plains area as defined by the plaintiffs in their complaint.

Neither the Bureau of Reclamation of the Department of Interior nor the Army Corps of Engineers grants water rights. The issuance of a water right permit is solely under the jurisdiction of the individual states.

The Bureau of Reclamation has executed no option contracts for water in the Northern Great Plains Region as defined by plaintiffs in their complaint since July, 1971, and denied one such application in September, 1973. The Bureau has pending twelve applications (from nine entities) for option contracts to purchase annual quantities of 502,000 acre-feet of water from the Yellowtail Unit of the Pick-Sloan Missouri Basin Program on the Big Horn River and one application for 9,000 acre-feet of water from the Boysen Unit of that Program on the Wind River. Applications are also pending for annual water needs for industrial use totaling 630,000 acre-feet from four entities to divert water from the Wind-Big Horn-Yellowstone River system; from seven entities to divert 360,000 acre-feet of water from Fort Peck Reservoir; from one entity to divert 18,000 acre-feet of water from Lake Tschida (Heart Butte Unit, North Dakota); and from five entities to divert 286,816 acre-feet of water from Lake Sakakawea (Garrison Reservoir, North Dakota). Some of the foregoing units of the Pick-Sloan Missouri Basin Program include joining responsibility with the Army Corps of Engineers. The Departments of the Army and the Interior are currently working to establish common marketing procedures to handle anticipated industrial water sales from main stem reservoirs in the Missouri River Basin. Finalization of one or more of the pending applications may materialize and require Secretarial approval prior to resolution of this case.

The Army Corps of Engineers is currently studying the type of contract and other marketing matters respecting the sale of water for industrial use from the Missouri River main stem reservoirs and has pending eleven applications by industrial users for purchase of 441,000 acre-feet of water per year. In addition, the Missouri River Division of the Corps is considering entering into water contracts with Lake Andes, South Dakota (municipal use), Sanitary and Improvement District No. 2 of Knox County, Nebraska (municipal and industrial use); Bowman County Water Management District, North Dakota (municipal and industrial use); and City of Gettysburg, South Dakota (municipal and industrial use).

*Inquiry No. 8*

How was the area to be covered by the EIS for the development of coal resources in the Eastern Powder River Coal Basin defined, and how was it determined that an EIS was appropriate for that area?

*Finding*

The appropriateness of the Eastern Powder River Coal Basin Impact Statement [5] and the definition of the area covered were determined as a result of consultations among the Department of Agriculture, the Department of the Interior, and the Interstate Commerce Commission, after a meeting on January 16, 1974, chaired by Deputy-Undersecretary of the Interior, William W. Lyons. The decision to do an impact statement on that area was made after applications for approval of mining plans and necessary rights-of-way were submitted by the Atlantic Richfield Company, the Carter Oil Company, the Kerr-McGee Corporation, and the Wyodak Resources Development Corporation, and an application to the Interstate Commerce Commission for construction of a railroad line was submitted by the Burlington-Northern, Inc., and the Chicago and Northwestern Transportation Company. The general parameters of the statement area were set out on a map which was

---

**5.** Issued October 18, 1974.

distributed at the January 16 meeting. There was no discussion of the factors listed in the preface of the Final Impact Statement (quoted below) at this meeting. The exact boundaries of the areas to be covered were then refined by the field team charged with preparing the final statement.

The preface of the Final Impact Statement, contains a further explanation of how the area was determined:

The four federal agencies have determined that approval of the pending applications would collectively constitute a major federal action having a significant effect on the quality of human environment. Therefore, the agencies have determined that to protect the public interests most effectively and to meet their individual responsibilities under the National Environmental Policy Act of 1969 most efficiently, they should jointly undertake the preparation of a single environmental impact statement which would consider not only the impacts of the several proposals but also the collective, cumulative impacts, primary and secondary, of the development of the coal resources in the area.

Further, to meet the intent of the Act in the most productive fashion, it is necessary to examine the general geographic area of the proposed and potential actions. The geographic area for basic consideration is that part of the Powder River Coal Basin in Wyoming lying generally eastward from the Powder River to the outcrop line of the coal resource and from somewhat north of Gillette to a point somewhat south of Douglas. The area delineation is based in part on present and anticipated levels of mining activity, differing quality of the coal resource, different physical arrangement of the coal beds, somewhat different mining techniques required and differing physical reclamation requirements. These considerations having a broader scope of geographic impact such as social conditions, economic factors, atmospheric influence, water resources, and recreation uses are treated on a larger regional basis than the primary study area. This statement discusses the existing environment, evaluates the collective impact of the proposed actions and, insofar as now possible, the impacts of potential future coal mining within the geographic area described above. This statement also examines in detail certain proposed activities for which federal actions are required.

*Inquiry No. 9*

Regarding environmental impact statements for individual projects in the Northern Great Plains area, where the statements have been issued after February 17, 1973, or prepared for projects that were commenced after that time—

a. Provide one or more representative statements.

b. Do the statements attempt to provide an assessment of the cumulative impact of the governmental action in the surrounding area?

c. Do the statements take into account the ecological setting created by private action in the area?

d. Has the government devised any procedure for cross-referencing among the individual statements?

*Finding*

9a The Forest Service of the Department of Agriculture has not issued, after February 17, 1973, any impact statements on individual projects relating to coal development in the Northern Great Plains area as defined by plaintiffs in their complaint.

The Department of Interior has issued the following three impact statements on projects within the Northern Great Plains as defined by plaintiffs in their complaint, and a copy of each is attached to these findings: "Crow Ceded Area Coal Lease, Westmoreland Resources Mining Proposals," attached hereto as Exhibit A; "Proposed Plan of Mining and Reclamation, Big Sky Mine, Peabody Coal Company Coal Lease M–15965, Colstrip, Montana," attached hereto as Exhibit B; "Development of Coal Resources in the Eastern Powder River Coal Basin of Wyoming," attached hereto as Exhibit C.

*9b* The impact statements contain comprehensive descriptions of the cumulative impact of the governmental action on the surrounding area, and this is established by the statements themselves. See for example, Chapter II of the Westmoreland EIS which contains over 100 pages discussing the environmental setting, and physical environment, and also Chapter III which discusses environmental impacts on the human environment, the physical impact, and impact on the market area.

The Peabody Environmental Impact Statement, contains a comprehensive description of the environmental impact of the proposal (pages 115–189) and, assesses the cumulative impact of the governmental action on the surrounding area.

The Eastern Powder River Coal Basin Environmental Impact Statement contains a comprehensive analysis of the environmental impact of the future federal action and considers past and possible future federal actions in the area relating to uranium (I–43, 191–194), oil and gas development (I–186–190), and coal gasification proposals (I–40–41, 57, 94–102). Chapter V of this Statement, "Probable Cumulative Regional Impacts," sets forth a regional analysis of the potential impact of coal development on such factors as socio-economic conditions, land tenure, transportation, recreation, and agriculture.

*9c* The impact statements consider the ecological setting created by private activity in a general way with regard to demography and economic and social conditions within the areas covered by the statement.[6] The government's knowledge of private industry's expectation regarding coal development is largely based on applications for mining plans or competitive coal leases submitted by private industry.[7]

*9d* The government has not devised any regular formalized procedure for cross-referencing among impact statements on individual projects. Cross-referencing in future statements will be utilized, however, where necessary to describe the existing environment which could be impacted by proposed actions.

The three representative impact statements attached to these findings do cross-reference to a limited degree. The Eastern Powder River Coal Basin impact statement contains parts relating to each of five different proposals and a separate part consisting of a regional analysis of the cumulative environmental impact on the entire Eastern Powder River Coal Basin. There are thus cross-references among individual *proposals* within the Eastern Powder statement. The Westmoreland Impact Statement contains a number of references to impact statements on other projects, marked by number in the text and appearing at the end of the Statement in a Table of References.[8] The Peabody Statement refers to other impact statements in a Table of References but does not correlate these to the text.[9]

6. *See* Westmoreland EIS at 93–99; Peabody EIS at 139–149; Eastern Powder EIS at I–392–458.

7. *See* Lyons deposition at 118.

8. *See* Westmoreland EIS at 201 ff.

9. *See* Peabody EIS at 430 ff.